# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

SECURITIES AND EXCHANGE
COMMISSION,

                    Plaintiff,                    Case No. 22-CV-450-JPS

v.

KAY X. YANG, XAPPHIRE LLC, and            **ORDER**
CHAO YANG,

                    Defendants.

## 1.      PROCEDURAL BACKGROUND

On April 13, 2022, Plaintiff Securities and Exchange Commission (the "SEC" or the "Commission") filed this action, alleging a variety of securities fraud claims against Defendants Kay X. Yang ("Kay") and Xapphire LLC ("Xapphire"), and a claim related to possession of allegedly ill-gotten funds against Relief Defendant Chao Yang ("Chao") (together with Kay and Xapphire, "Defendants"). ECF No. 1. On April 27, 2022, the SEC filed an amended complaint containing the same factual allegations. ECF No. 4. Xapphire was served with the amended complaint through its registered agent on May 5, 2022; Kay and Chao were personally served with the amended complaint on May 7, 2022. ECF Nos. 8–10. Consequently, Xapphire's response to the amended complaint was due on May 26, 2022 and Kay's and Chao's response to the amended complaint was due on May 31, 2022. Fed. R. Civ. P. 12(a)(1)(A)(i). On June 23, 2022, having received no response to the amended complaint from any of the Defendants, the SEC

requested entry of default. ECF No. 13. The Clerk of Court entered default on June 24, 2022.

Thereafter, on June 27, 2022, July 15, 2022, July 19, 2022, and July 21, 2022, Kay and Chao filed, pro se, a variety of notices and affidavits. ECF Nos. 14–15, 18–21. The Court granted the SEC's motion to strike these filings, finding them unauthorized under the Federal and Local Rules, irrelevant, and prejudicial to the SEC. ECF No. 23. The Court also denied a "Motion for Release and Full Settlement," filed by Defendants on July 12, 2022, ECF No. 16, because, like the notices and affidavits, it was an unauthorized filing and irrelevant. Specifically, the document was not a proper responsive pleading in this action, nor was it a motion to set aside default. ECF No. 23 at 3. Because Defendants were in default, the Court granted them until August 12, 2022 "to file an appropriate motion to set aside the Clerk of Court's entry of default, taking care to demonstrate to the Court why 'good cause' exists therefor." ECF No. 23 at 3.

Following that order, Kay and/or Chao filed: (1) two motions to dismiss, ECF Nos. 24, 26; (2) a letter requesting that the Court sign an IRS Form 56 "in order to continue to do business" with Kay and Chao and requesting payment from the Court, ECF No. 25; (3) copies of UCC Financing Statements naming as "debtors-in-possession" the SEC, the SEC's attorneys, the Commodity Futures Trading Commission (the "CFTC"), the CFTC's attorneys, the Department of the Treasury, the FBI, a federal agent, the United States District Court for the Eastern District of Wisconsin, and this Judge as well as Magistrate Judge Nancy Joseph (both listed at the address of the federal courthouse), ECF Nos. 28, 29; (4) documents titled "Proof of Claim for Internal Revenue Taxes" stating that the Seventh Circuit and the SEC are indebted to the United States in

the amount of $16.5 million, ECF Nos. 31, 32; (5) a letter from Kay to the SEC informing the SEC that its "fraudulent[]" and "false" claim is "adjourned," and requesting a "full accounting relating in any way to . . . [the SEC's] intrusion" upon Kay, ECF No. 33; (6) a motion to set aside default, ECF No. 34; and (7) a counterclaim against the SEC, ECF No. 39.

On December 19, 2022, the Court issued an order that, among other things, denied the motions to dismiss, struck many of the above-listed filings, denied the motion to set aside default, and dismissed the counterclaim. ECF No. 40. As to the motions to dismiss, the Court held that they were both untimely and frivolous:

> The first motion to dismiss questions the Court's status as a government agency, speculates that the Court "must be a business, must be a bank" because the Court employs a clerk, and attributes "dishonor" to the Court for denying Defendants' prior unauthorized filings. ECF No. 24 at 2. It does not address at all the substantive merits of this case— that is, that Defendants allegedly violated securities laws[.]

> The second motion to dismiss requests that the case be dismissed for the SEC's failure to respond to Kay's and Chao's first motion to dismiss within 10 days. ECF No. 26 at 1–2 . . . . Civil Local Rule 7(b) provides that a non-moving party has 21 days to respond to a motion to dismiss. Kay and Chao may not unilaterally adjust that date.

*Id.* at 8–9. With respect to the above-listed filings, the Court found that "[a]s with the documents subject to the Court's [prior order], the documents are not authorized filings (which, at this juncture, would only have been a motion to set aside default [. . .]), they are irrelevant, and they are prejudicial to the SEC." *Id.* at 4.

The Court determined that the motion to set aside default failed to meet the Rule 55(c) standard to do so:

[O]n October 18, 2022, Kay filed a document appropriately titled "Motion to Set Aside Default," and accompanied the filing with an affidavit . . . . . First, Kay avers that she was never served with the complaint and is unsure who the plaintiff is because the SEC "is an entity [and] has no contracts with Kay Yang." . . . . Second, Kay contends that the complaint fails to provide her notice of the factual allegations against her . . . . Third, Kay contends that default was improperly entered because the SEC supported its motion for entry of default with a declaration in lieu of an affidavit.

The SEC submitted proof of personal service on Kay at her residence, which residence is the same return address Kay uses on all her filings with the Court . . . . "A signed return of service constitutes prima facie evidence of valid service which can be overcome only by strong and convincing evidence." *Tate v. Milwaukee Cnty. Jail*, No. 06-C-670, 2008 WL 4501513, at *3 (E.D. Wis. Sept. 30, 2008). Kay has offered no such evidence.

That Kay believes the complaint does not sufficiently describe the allegations also does not demonstrate good cause to set aside default; Kay could have appeared and timely presented that defense under Rule 12. She did not. Finally, an attorney declaration constitutes a showing "by affidavit or otherwise" within the meaning of Rule 55(a) . . . . Even if it did not, such an argument would not provide a basis to support a failure to timely defend, given that Kay was served with this lawsuit on May 7, 2022, but did not begin filing anything in this case until June 27, 2022 (notwithstanding that the June and July 2022 filings have, by and large, all been struck as unauthorized, irrelevant, or prejudicial). The Court will deny Kay's motion to set aside default, and the Clerk's June 24, 2022 entry of default against Defendants will stand.

*Id.* at 10–11 (some internal citations omitted). Finally, the counterclaim was dismissed as barred by Section 21(g) of the Exchange Act of 1934, 15 U.S.C. § 78u(g). *Id.* at 11.

Now before the Court is the SEC's motion for default judgment. ECF No. 45. Neither Kay, Chao, nor Xapphire has filed an opposition to the

motion, despite having been served with it by U.S. mail and email, ECF No. 45 at 2, as well as having been served by U.S. mail with the Court's orders setting the briefing schedule for the motion, ECF Nos. 40, 42. *See* Fed. R. Civ. P. 5(b) (explaining proper forms of service of process); Fed. R. Civ. P. 55(b)(2) (service requirement). The Court therefore treats the motion as unopposed. Civ. L.R. 7(b), (d). For the reasons set forth herein, the motion will be granted. Further, as explained below, the SEC has established Defendants' liability and proven up damages. The SEC has demonstrated its entitlement to equitable relief, including a permanent injunction and disgorgement. The SEC has also demonstrated its entitlement to a civil penalty, and that the amount of such a penalty is ascertainable with certainty from the SEC's filings, including a detailed affidavit. Therefore, judgment by default will be entered accordingly.

## 2. LEGAL STANDARD

Upon entry of default, "the well-pleaded allegations of a complaint relating to liability are taken as true." *VLM Food Trading Int'l., Inc. v. Ill. Trading Co.*, 811 F.3d 247, 255 (7th Cir. 2016) (internal citation and quotation marks omitted). "Accepting those facts as true, a court must determine whether those facts establish that the plaintiff is entitled to the relief it seeks." *Cree, Inc. v. BHP Energy Mex. S. de R.L. de C.V.*, 335 F. Supp. 3d 1105, 1111 (E.D. Wis. 2018) (internal citation omitted). If they do, the Court may, in its discretion, grant default judgment to the movant. *See Domanus v. Lewicki*, 742 F.3d 290, 301 (7th Cir. 2014).

Even if default judgment is granted, a plaintiff nevertheless bears the responsibility to prove up its damages under Rule 55(b)(2) of the Federal Rules of Civil Procedure. Indeed, "even when a default judgment is warranted based on a party's failure to defend, the allegations in the

complaint with respect to the amount of the damages are not deemed true," and the Court must conduct an inquiry to ascertain the amount of damages with reasonable certainty. *e360 Insight v. The Spamhaus Project*, 500 F.3d 594, 602 (7th Cir. 2007) (citations and quotations omitted). Judgment by default may not be entered without a hearing on damages unless "the amount claimed is liquidated or capable of ascertainment from definite figures contained in the documentary evidence or in detailed affidavits." *Id.* (citation omitted). Judgment by default may also include an award of equitable relief, including the entry of a permanent injunction, where the party seeking such relief demonstrates its entitlement thereto. *Id.* at 604.

### 3. FACTS IN THE AMENDED COMPLAINT[1]

#### 3.1 The Parties

Kay is the founder and owner of AK Equity Group LLC ("AK Equity") and Xapphire Fund LLC (the "Xapphire Fund"). Kay has never been licensed by a securities regulator. Xapphire is a Delaware limited liability company formed in December 2018 with its principal place of business in Mequon, Wisconsin. Kay is the CEO and co-founder of Xapphire and controls all of its operations. Xapphire is the managing member of the Xapphire Fund. Chao is Kay's husband.

AK Equity was a Delaware limited liability company formed in March 2017 with its principal place of business in Mequon, Wisconsin. Kay both owned and controlled AK Equity, and she voluntarily withdrew its status as a Delaware company in 2021. AK Equity was formed for the

---

[1] The factual allegations in this Section are reproduced, with minor edits, from the SEC's amended complaint. ECF No. 4. Internal citations are omitted for brevity.

purpose of conducting foreign exchange trading using pooled money obtained from multiple investors.

The Xapphire Fund is a Delaware limited liability company formed in December 2018 with its principal place of business in Mequon, Wisconsin. Kay is the Xapphire Fund's CEO and founder. The Xapphire Fund's private placement memorandum ("PPM") described it as "a hedge fund initially investing in currencies, via the Foreign Exchange."

From approximately April 2017 through April 2021, Kay raised at least $16.5 million from approximately 70 investors through two fraudulent offerings, consisting of the offer and sale of: (a) investment contracts issued by AK Equity, and (b) membership interests in the Xapphire Fund. Neither of these offerings was registered with the Commission.

Kay's investors are residents of at least eight states. A majority of them are members of the Hmong-American communities. Some do not speak English as a first language, and some were not sophisticated investors. Kay solicited the investors through a publicly available website, in-person meetings at her Wisconsin home, and at other events in Wisconsin and Minnesota. Kay also relied on word-of-mouth recommendations within the Hmong-American community.

### 3.2    The AK Equity Offering

In April 2017, Kay began raising money through the AK Equity offering. Most AK Equity investors signed a limited power of attorney form appointing AK Equity to act as an agent to purchase and sell foreign exchange contracts. The forms used by Kay stated that investors would have their own AK Equity trading account and would receive a pro-rata share of profits from AK Equity's managed trading account. However, Kay opened trading accounts only in her name and the name of her corporate

entities. She did not open any trading accounts in the name of individual investors, and investors were not able to access the trading accounts.

Kay told investors that she would invest their money mainly in foreign exchange trading, but that she also could use her discretion to invest in securities. Kay also told at least two investors that she would invest their money in stocks. Kay provided certain investors, before accepting their investments, with AK Equity hand-outs stating that the first $5 million in contributions would be allocated to "100% Forex." However, this same document also stated that after AK Equity's assets exceeded $5 million, it would invest at least 40% of its capital in securities; and, after AK Equity's capitalization exceeded $15 million, securities would comprise 80% of its assets. Kay also told investors that their contributions would be pooled with those of other investors to increase their trading power. Although Kay did commingle investor contributions, she only used some of the investors' contributions for foreign currency trading.

Kay distributed an AK Equity hand-out to at least three investors in late 2018, before accepting their investments, which contained a chart representing AK Equity's monthly investment results during 2018. The document purported to show that, from January to August 2018, AK Equity's results were positive, with monthly returns ranging from 0.98% to 8.7%. Kay also told AK Equity investors, both orally and in writing, that AK Equity would be paid 35% of the monthly profits generated by their trading, as well as a 2% annual fee on the assets under management. However, for certain clients, Kay agreed to a lower rate for one or both fees. 31. From 2017 to 2019, Kay raised approximately $14 million for AK Equity from approximately 50 investors.

### 3.3 The Xapphire Fund Offering

In late 2018, Kay launched the Xapphire Fund. Kay told the investors in AK Equity that their investments would be "rolled over" into the Xapphire Fund and that her share of the fund's monthly profits would be reduced from 35% to 10%. In all other respects, their investments would continue unchanged. From 2019 to 2021, Kay raised approximately $2.5 million for the Xapphire Fund. Kay obtained these funds from approximately 22 new investors, as well as from 12 investors who previously had invested in AK Equity.

Kay told investors that they were purchasing membership interests in the Xapphire Fund, which would invest "primarily" in foreign currencies. The Xapphire Fund's PPM also stated the fund would achieve its objectives by also investing in equity and debt securities. In addition, the PPM stated that Xapphire retained complete control over the Xapphire Fund's management and operations. Kay also represented to investors, both orally and in offering documents, that their money would be pooled with those of other investors. Kay represented to investors that Xapphire would be paid 10% of the profits generated by their trading, as well as a 2% annual fee on the assets under management. However, for certain clients, Kay agreed to a lower rate for one or both fees.

The Xapphire hand-out also included a chart, similar in appearance to the AK Equity hand-out, purporting to show a positive gross profit for every month in 2018. At least three of the AK Equity investors also received the Xapphire hand-out prior to making investments in the Xapphire Fund.

### 3.4 Kay Misappropriated Investor Money

Kay raised approximately $16.5 million from investors in AK Equity and the Xapphire Fund. Kay used at least $4.5 million in investor

contributions, or more than 25% of the total amount raised in both offerings, to benefit herself or members of her family. Kay spent some investor contributions directly from AK Equity or Xapphire bank accounts and transferred other investor contributions to her own personal accounts or to the accounts of other businesses she and Chao controlled. From this same amount, Kay also transferred at least $800,000 in investor contributions to Chao, who had no right to receive these funds.

Kay and Chao used more than $3 million in investor contributions to pay for real estate, living expenses, travel, and luxury automobiles. More specifically, between April 2017 and June 2021 Kay and Chao spent: (1) nearly $1.5 million on residential real estate, including four homes in Wisconsin and Minnesota; (2) approximately $790,000 for living expenses, $70,000 for restaurants, $46,000 to Amazon, $20,000 to Sam's Club, and thousands more for landscaping, housecleaning services, concert tickets, pet stores, spa services, grocery stores, and other retailers, including Gucci, Louis Vuitton, Kay Jewelers, Wayfair, Target and Home Depot; (3) around $585,000 on personal and family travel, including at least $110,000 for a trip with 60 guests referred to as "Kay's Family Trip to Maui" in June 2018, at least $80,000 for a trip with more than 20 guests to Bangkok, Thailand in June 2019, at least $52,000 for a Royal Caribbean cruise in February 2019, and trips to a number of other locations including Cancun and Las Vegas; and (4) approximately $313,000 on luxury cars.

In addition, between April 2017 and April 2021, Kay and Chao withdrew approximately $1.4 million from investor funds, in more than 1,000 separate transactions. Kay and Chao used some of those funds for gambling and spent the remainder for their own personal benefit. Based on the total amount of investor funds that Kay and Chao withdrew at casinos

or used to pay for their personal expenses, plus the amounts that Kay used to repay prior investors in a previous venture, Kay illegally misappropriated at least $4,060,000 in investor funds.

### 3.5 Kay Misrepresented the Performance of AK Equity and the Xapphire Fund

Kay repeatedly told investors that the returns achieved by AK Equity and Xapphire Fund were profitable and performing well. From late 2018 to 2019, Kay provided AK Equity investors with offering materials showing that AK Equity's foreign exchange trading achieved positive monthly returns between January through August 2018. At least three individuals invested after receiving an AK Equity hand-out containing these representations. These representations were false. AK Equity actually experienced monthly trading losses in January, February, May, June, and August 2018. AK Equity had no trading activity in March or April 2018. AK Equity also lost money in November and December 2018.

In 2019, Kay represented in offering materials to Xapphire Fund investors that the Xapphire Fund's foreign exchange trading achieved positive monthly returns in every month during 2018; the materials also told investors they could expect annual returns of between 20% and 40%. These representations were false, for several reasons. First, the Xapphire Fund did not exist until December 2018, and it did not have a trading account in its own name until April 2019. Second, the results presented in the hand-out did not refer to AK Equity's trading results. Third, Kay had never achieved annual positive trading gains of between 20% and 40%. In 2017, Kay's trading in AK Equity resulted in a net loss of approximately $150,000. And in 2018, Kay's monthly trading losses exceeded monthly trading gains by approximately $606,000.

Case 2:22-cv-00450-JPS   Filed 04/26/23   Page 11 of 39   Document 48

In or about December 2018, Kay told prospective AK Equity investors that AK Equity was generating annual profits of between 40% and 50%. Kay repeated these same misrepresentations to an AK Equity investor during a March 2019 meeting at her home. These representations were false. As of the time Kay made these statements, AK Equity had never had a year with positive trading results, let alone a year with gains of between 40% and 50% returns. Several of the investors who invested in AK Equity after attending meetings with Kay in December 2018 and March 2019 subsequently invested in the Xapphire Fund; they were told that their initial AK Equity investments were "rolled over" into Xapphire Fund.

From 2017 to approximately 2020, Kay provided AK Equity and Xapphire investors with access to online statements showing personal account balances. Several of these investors have advised SEC investigators that all of those statements showed their personal investments were profitable and increasing in value. For example, one investor stated that according to the online statements, the value of his account had increased between 30% and 50%. Another investor stated that according to the online statements, the value of his account had doubled within one year; another investor stated that his online account statements showed that the value of his account had tripled within three years. Two of these investors made additional contributions after seeing the purported profitable performance of their investment accounts. The online account statements that Kay provided to investors were false. None of the investment accounts which Kay opened for AK Equity or the Xapphire Fund ever achieved annual positive returns.

### 3.6 The Wisconsin Order

On July 13, 2020, the Wisconsin Department of Financial Institutions, Division of Securities, issued a Final Order by Consent to Cease and Desist, Revoking Exemptions, and Imposing Disgorgement, Restitution, and Civil Penalties against Kay, AK Equity, the Xapphire Fund and Xapphire (the "Wisconsin Order").

The Wisconsin Order contained a number of findings of fact, to which Kay and Xapphire consented, including that none of them were registered with the Wisconsin Division of Securities in any capacity and had failed to disclose this fact to investors. The Wisconsin Order also found that Kay, AK Equity Group, and Xapphire had violated Wisconsin law by raising millions of dollars from investors while failing to register as investment advisers.

The Wisconsin Order required Kay to pay $16,950,777 in restitution to her investors, disgorge up to $4,231,998 in profits, and pay a $50,000 civil penalty. However, to date Kay has not paid the amounts she owes.

### 3.7 Defendants Cannot Repay AK Equity and Xapphire Fund Investors

Following the issuance of the Wisconsin Order, an increasing number of Kay's investors have attempted to withdraw their principal contributions or purported profits from AK Equity or the Xapphire Fund. Kay has delayed or avoided complying with many of those requests by offering investors a variety of excuses. Kay has returned some money to a few investors but has denied repayment requests from others.

The most recent investor repayment by AK Equity or Xapphire which could be confirmed by SEC investigators occurred in January 2021 and was in the amount of $7,000. Since then, Kay has refused or been unable

to comply with the repayment requests made by many investors. Indeed, Kay has ceased all communications with most of her investors. However, Kay continues to reassure those AK Equity and the Xapphire Fund investors with whom she still communicates that their money is safe, and that they "don't need to worry" because repayments will be forthcoming. She also stated that she had "plenty of funds" to cover distributions and continues trading.

Kay's representations about her ability to repay investors are false. The SEC has obtained and reviewed bank account and brokerage account records for both Kay and Chao, as well as for AK Equity, Xapphire, and the Xapphire Fund. None of those accounts has any significant remaining balances, either in cash, foreign currency, or securities.

### 3.8 Kay Has Continued to Raise Funds for a New Venture and Misrepresent Her Prior Activities

Despite all of the losses described above, Kay has continued to raise additional funds from the Hmong-American communities in Wisconsin and Minnesota. More specifically, Kay has raised millions of dollars from investors for a new investment vehicle that she has described as "Xapphire G Fund" ("Xapphire G"). According to investors, Kay has described the Xapphire G venture as foreign exchange trading, similar to AK Equity and the Xapphire Fund.

The SEC has confirmed that Kay is using offshore bank and brokerage accounts for her Xapphire G venture. However, to date the SEC has been unable to obtain sufficient investment documents, trading records, or account statements, either from Kay or Xapphire G investors, to determine whether Xapphire G is a real investment fund or a fraud. Although Kay has produced some documents in response to SEC

subpoenas, in July 2021, she asserted her Fifth Amendment privilege against producing additional documents and providing sworn testimony to the SEC. The SEC has subpoenaed both Kay and Chao to testify about AK Equity, the Xapphire Fund, and the use of funds raised by investors. Neither Kay nor Chao has appeared to testify.

In response to an SEC subpoena, Kay produced what she claimed were account statements from a foreign brokerage company, known as LMAX, showing mostly profitable trading during 2019. However, these account statements were fake; some had been altered to inflate the monthly profits or to show a much smaller monthly loss than her actual trading results. Kay actually incurred more than $2 million in losses while trading through LMAX during 2019.

On February 23, 2022, the U.S. District Court for the Eastern District of Wisconsin issued a warrant authorizing a search of Kay and Chao's home in Mequon, Wisconsin for financial and computer records relating to AK Equity, Xapphire, the Xapphire Fund, and the Xapphire G Fund. The warrant's supporting declaration attests that Kay received more than $15 million for investment purposes, based on false or inaccurate disclosures, that Kay used a portion of those funds for foreign exchange trading and incurred significant losses, and that Kay spent millions of dollars in investor funds on gambling, as well as on purchases for herself and her family.

4.    ANALYSIS

The SEC brings four claims against Kay and Xapphire: (1) violations of Section 5(a) and (c) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77e(a) and (c); (2) violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a)(1)–(3); (3) violations of Section 10(b) of the Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder,

17 C.F.R. § 240.10b-5; and (4) violations of Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 (the "Advisers Act"), 15 U.S.C. § 80b-6(1) and (2). The SEC also brings a claim against Chao related to his receipt of improper and illegal transfers of investor funds from Kay and Xapphire.

As noted, the Court takes the above factual allegations set forth in the amended complaint relating to liability as true. *VLM Food*, 811 F.3d at 255. However, the Court still must determine whether those facts establish that the SEC is entitled to relief. *Cree*, 335 F. Supp. 3d at 1111. For the reasons explained below, the Court determines that the SEC is entitled to relief on all of its claims.

### 4.1    The SEC's Entitlement to Relief

As an initial matter, the Court concludes that all of the investments in AK Equity and the Xapphire Fund constitute securities. Both the Securities Act and the Exchange Act define "security" to include an investment contract. *S.E.C. v. Edwards*, 540 U.S. 389, 393 (2004) (distinguished on other grounds by Wisconsin state law) (citing 15 U.S.C. §§ 77b(a)(1), 78c(a)(10)). "The test for whether a particular scheme is an investment contract" involves an assessment of "whether the scheme [1] involves an investment of money [2] in a common enterprise [3] with profits to come solely from the efforts of others." *Id.* (quoting *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946)).

In this case, investors sent Kay or her entities money for investment purposes. Investors were told that their money would be pooled together, their money was in fact pooled together, and investors were told that the profits would be distributed pro rata. *See Stenger v. R.H. Love Galleries, Inc.*, 741 F.2d 144, 146 (7th Cir. 1984) ("This Circuit has strictly adhered to a 'horizontal' test of common enterprise, under which multiple investors

must pool their investments and receive pro rata profits."). Investors also had an expectation of profits based on the efforts of others; specifically, Kay and her entities. As to the Xapphire Fund specifically, the same is true as to Kay's representations to investors that they were purchasing membership interests in the Xapphire Fund. *See Shirley v. JED Cap., LLC*, 724 F. Supp. 2d 904, 910 (N.D. Ill. 2010) ("Interest in an LLC may be a security where the members are so dependent on a manager that they cannot replace him or exercise ultimate control without him.").

### 4.1.1 Violations of Section 5(a) and (c) of the Securities Act, 15 U.S.C. § 77e(a) and (c)

Sections 5(a) and (c) of the Securities Act, 15 U.S.C. § 77e(a) and (c), provide that it is unlawful for any person directly or indirectly "to make use of any means or instruments of transportation or communication in interstate commerce or of the mails," in order to sell securities, unless a registration statement has been filed and is in effect. Therefore, these provisions contain three elements that the SEC must prove: (1) the defendant offered or sold securities (2) as to which no registration was in effect, using (3) interstate transportation or communication, or the mails. *Sec. & Exch. Comm'n v. Spence & Green Chem. Co.*, 612 F.2d 896, 901 (5th Cir. 1980). There is no scienter requirement. *S.E.C. v. Holschuh*, 694 F.2d 130, 137 n.10 (7th Cir. 1982). The burden of proof is on the defendant to come forward with an exemption to the registration requirement. *Sec. & Exch. Comm'n v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953).

All three elements are met here. Kay and Xapphire sold securities. No registration statements were in effect or were filed in connection with either the AK Equity or Xapphire Fund offerings. Kay used the internet, word-of-mouth across states, and electronic communication in writing to

sell the securities, among other instruments of interstate commerce. Kay and Xapphire have not come forward with an exemption to the registration requirement. *Pretzel & Stouffer, Chartered v. Imperial Adjusters, Inc.*, 28 F.3d 42, 46 (7th Cir. 1994) ("[A] defendant's response to a motion for default judgment [is] insufficient if it lack[s] a grounding in facts which would support a meritorious defense of the action by the non-moving party.") (citations omitted). Therefore, the SEC is entitled to relief for Kay's and Xapphire's violations of Section 5(a) and (c) of the Securities Act, 15 U.S.C. § 77e(a) and (c).

### 4.1.2 Violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a)(1)–(3); and Violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5

Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a)(1), prohibits use of interstate commerce in the offer or sale of securities where such use is

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) (prohibiting fraud "in connection with the purchase or sale of any security") together with Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, prohibit using interstate commerce

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

A violation of Section 17(a)(1) of the Securities Act and Section 10(b) of the Exchange Act requires proof of scienter. *Aaron v. Sec. & Exch. Comm'n*, 446 U.S. 680, 695 (1980). Scienter is not required for violations of Section 17(a)(2) and (a)(3) of the Securities Act. *Id.* Scienter may be satisfied by either proof that the defendant "knew the statement was false" or that the defendant "was reckless in disregarding a substantial risk that it was false." *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704 (7th Cir. 2008). Regardless of whether scienter is required, the materiality requirement is satisfied if a reasonable investor would consider the false statement important. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988).

All requirements are met here. Kay and Xapphire, through Kay's oral and written representations, told investors that their money would be invested, that investment results were positive with high monthly returns, and that Kay achieved annual returns between 20% to 50%. *See United States Sec. & Exch. Comm'n v. Markusen*, 143 F. Supp. 3d 877, 889 (D. Minn. 2015) (CEO and manager of LLC, as well as LLC itself, "are each independently liable for . . . misstatements under Rule 10b-5(b) because each was a person or entity with ultimate authority over the statement, including its content and whether and how to communicate it") (internal citations omitted).

The oral and written representations were false. Kay and Xapphire raised approximately $16.5 million from investors, but misappropriated

millions of those funds for Kay's and Chao's personal benefit and to live a luxury lifestyle. Kay provided false statements to investors showing that their investments were profitable. Investors advised the SEC that the reason they invested with Kay is because they understood that she would increase their investments' value. ECF No. 46-1 at 5.

Kay and Xapphire also acted with scienter. Kay knew that she was only using portions of investor money to invest and misusing the remainder to fund her and Chao's lifestyle, she knew that her investments were not profitable and that the account statements were false, and she knew that she had never achieved annual returns between 20% and 50%. As with the communication of the statements, Kay's scienter is attributed to Xapphire. *See Sec. & Exch. Comm'n v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1089 n.3 & 1096–97 nn.16–18 (2d Cir. 1972). Therefore, the SEC is entitled to relief for Kay's and Xapphire's violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a)(1)–(3) and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

### 4.1.3 Violations of Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. § 80b-6(1) and (2)

Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-6, defines "investment adviser" as any person who, for compensation, "engages in the business of advising others, either directly or through publications and writings" as to the values or security or the advisability of investing in securities or who, for compensation, "issues or promulgates analyses or reports concerning securities."

In this case, Kay acted as an investment adviser to investors in the AK Equity offering. Most investors signed a limited power of attorney form appointing AK Equity as an agent to purchase and sell securities. Kay also

Case 2:22-cv-00450-JPS   Filed 04/26/23   Page 20 of 39   Document 48

told investors she could use her discretion to invest in securities; in other words, investment may not be limited to foreign exchange trading. *See, e.g.*, *United States v. Elliott*, 62 F.3d 1304, 1310 (11th Cir. 1995), *amended*, 82 F.3d 989 (11th Cir. 1996) ("Elliott and Melhorn clearly have provided investment advice to their customers, both by advising them in their choice among Elliott Enterprise investment vehicles and by controlling the investments underlying those investment vehicles."). For the same reasons, Kay and Xapphire also acted as investment advisers to investors in the Xapphire Fund. Specifically, in lieu of a power of attorney form, Kay told Xapphire Fund investors that she would invest "primarily" in foreign currencies, and she distributed the PPM stating that Xapphire retained complete control over the fund. Because Kay and Xapphire misappropriated investors' (their clients') money, they received compensation for their services. *See id.* at 1311; *see also United States v. Miller*, 833 F.3d 274, 282 (3d Cir. 2016) ("The principal [the investors] provided became Miller's compensation—his 'economic benefit'—when he commingled investors' accounts and spent the money for his own purposes.").

As investment advisors, Kay and Xapphire violated Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. § 80b-6(1) and (2). Under those provisions, it is unlawful for an investment adviser to use interstate commerce, either directly or indirectly, to "(1) to employ any device, scheme, or artifice to defraud any client or prospective client" or "(2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." With a private fund, the "client" is the fund itself; not the investors. *Goldstein v. S.E.C.*, 451 F.3d 873, 881 (D.C. Cir. 2006). The investment adviser, in that role, owes the fund fiduciary duties, which require that the adviser be disinterested, avoid

fraud and deceit, and operate in good faith. *Id.*; *Sec. & Exch. Comm'n v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 191 (1963) (delineating fiduciary duties).

Section 206(1) carries a scienter requirement, which includes recklessness. *S.E.C. v. Steadman*, 967 F.2d 636, 641–42 (D.C. Cir. 1992) (defining recklessness in this context as an "extreme departure from the standards of ordinary care which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it") (internal citations omitted). Section 206(2) does not carry a scienter requirement. *Id.* at 643 n.5.

The same conduct supporting Kay's and Xapphire's violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a)(1)–(3) and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, supports their violations of Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. § 80b-6(1) and (2). Kay and Xapphire violated their fiduciary duties. *See S.E.C. v. Chiase*, No. 10-CV-5110, 2011 WL 6176209, at *5 (D.N.J. Dec. 12, 2011) ("no question" that "lying to [] clients and intentionally misappropriating funds" violate fiduciary duties imposed on investment advisors). Kay also had the requisite scienter. Kay controlled the flow of money, and the fact that not all investor money went to investments was clearly known to Kay, or so obvious that she must have been aware of it. As noted above, Kay's scienter is attributed to Xapphire. *Manor Nursing Centers, Inc.*, 458 F.2d at 1089 n.3 & 1096–97 nn.16–18.

### 4.1.4   Liability Against Chao

The SEC has not accused Chao of violating any securities laws. However, it is able to bring—and has brought—a claim against Chao to recover his "ill-gotten gains." *S.E.C. v. Cherif*, 933 F.2d 403, 413 (7th Cir.

1991). The vehicle the SEC has chosen to do so is naming Chao as a "Relief Defendant"; in other words, he is joined "purely as a means of facilitating collection." *Id.* at 414.

A court order is needed to order a relief defendant "to turn over funds to the prevailing party when the dispute between the parties is resolved." *Id.* The court order may be in the form of ordering the equitable remedy of disgorgement. *S.E.C. v. George*, 426 F.3d 786, 798 (6th Cir. 2005). Such a remedy is available to a defendant "not accused of wrongdoing in a securities enforcement action" but who "(1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds." *Id.* In this case, both elements are clearly met. Therefore, the SEC has established its entitlement to relief on all of its claims.

### 4.2    Remedies

Having determined that the SEC has established its entitlement to relief on all of its claims (i.e., Defendants' liability), the Court turns to whether the SEC has adequately proven up damages and demonstrated its entitlement to appropriate remed(ies). For the reasons explained below, the Court determines that the SEC has demonstrated its entitlement to equitable relief, including a permanent injunction, as well as its entitlement to the imposition of a civil penalty. The Court further determines that the amount of such a penalty is determinable with certainty from the SEC's filings, including a detailed affidavit with attachments, such that the need for a hearing is obviated. *e360 Insight*, 500 F.3d at 602.

#### 4.2.1    Permanent Injunction

Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d)(1), and Section 209(d) of the Advisers Act, 15 U.S.C. § 80b-9(e), authorize the SEC to seek injunctive relief against

anyone who "is engaged or is about to engage" in actions or practices violating those Acts. When imposing a permanent injunction for violations of the securities laws, "the critical question . . . is whether there is a reasonable likelihood that the wrong will be repeated." *S.E.C. v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 807 (2d Cir. 1975) (internal citations omitted).

To assess whether there is a reasonable likelihood of future violations, courts must consider the totality of the circumstances, including factors such as

> (1) the gravity of harm caused by the offense; (2) the extent of defendant's participation; (3) defendant's degree of scienter; (4) the isolated or recurrent nature of the infraction; (5) the likelihood that defendant's customary business activities might again involve [her] in such transactions; (6) defendant's recognition of [her] own culpability; and (7) the sincerity of defendant's assurances against future violations.

*S.E.C. v. Kimmes*, 799 F. Supp. 852, 860 (N.D. Ill. 1992), *aff'd sub nom. S.E.C. v. Quinn*, 997 F.2d 287 (7th Cir. 1993). Based on these factors, permanent injunctive relief is clearly warranted here. Kay and Xapphire harmed members of the Hmong-American community, whose knowledge of both the English language and securities investments were low. The scheme lasted over four years. Kay's scienter (which extends to Xapphire) is clear and egregious in light of her excessive expenditures designed to support a lavish lifestyle for herself and Chao.

Additionally, Kay has demonstrated not only that she will continue to violate the Acts, but she has, in fact, already done so. Despite entry of the Wisconsin Order in July 2020, Kay has neglected to repay the amounts she owes; instead, she has worked to create a new venture, Xapphire G, and continued to raise funds from the Hmong-American communities for

Xapphire G. In response to subpoenas regarding her entities and ventures, Kay has produced fake or fraudulent documents. Therefore, not only is a legal remedy inadequate, but likelihood of recurrence is a certainty. *e360 Insight*, 500 F.3d at 604 (explaining the importance of "demonstrat[ing] the inadequacy of legal relief" when imposing a permanent injunction as a remedy with a default judgment); *Kimmes*, 799 F. Supp. at 860.

The SEC requests that Kay and Xapphire be permanently restrained and enjoined from violating (1) Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; (2) Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a); and (3) Section 206(1) and 206(2) of the Advisers Act of 1940, 15 U.S.C. § 80(b)-6(1) and 80b-6(2). The request is amply supported by the SEC's exhaustive description of Kay's and Xapphire's violations of these Acts, and the likelihood (and actual existence of conduct showing) that they will continue to do so. *Kimmes*, 799 F. Supp. at 861 (imposing permanent injunction under Section 10(b) of the Exchange Act and Section 17(a) of the Securities Act where "[a]ll of the evidence demonstrates that [the violator] is incorrigible"); *Sec. & Exch. Comm'n v. Rashid*, No. 17-CV-8223 (PKC), 2020 WL 5658665, at *26 (S.D.N.Y. Sept. 23, 2020) (imposing permanent injunction under Section 206 of the Advisers Act where the violator "did not alter his behavior even after learning" that he had been exposed). The Court will therefore enter the permanent injunction on all three grounds, as set forth at the conclusion of this Order and by separately entered default judgment.

### 4.2.2   Officer and Director Bar

Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), and Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), permit the Court to permanently enjoin a person who has violated Section 17(a)(1) of the

Securities Act and Section 10(b) of the Exchange Act from acting as an officer or director of any issuer of publicly-traded securities if the person's conduct "demonstrates unfitness to serve as an officer or director of any such issuer."

Courts consider similar sets of factors as those used to determine a reasonable likelihood of future violations, *see supra*, to determine unfitness. Those factors are:

> [1] the egregiousness of the defendant's actions, [2] the isolated or recurrent nature of the infraction, [3] the degree of scienter involved, [4] the sincerity of the defendant's assurances against future violations, [5] the defendant's recognition of the wrongful nature of [her] conduct, and [6] the likelihood that the defendant's occupation will present opportunities for future violations.

S.*E.C. v. Bankosky*, 716 F.3d 45, 49 (2d Cir. 2013) (quoting *Steadman v. S.E.C.*, 603 F.2d 1126, 1140 (5th Cir 1979)). For the same reasons set forth above, and again emphasizing Kay's continued violations of the Acts, the Court finds that a permanent officer and director bar as to Kay is appropriate. *See Sec. & Exch. Comm'n v. Durham*, 370 F. Supp. 3d 954, 963 & 966 (S.D. Ind. 2019), *aff'd*, 799 F. App'x 928 (7th Cir. 2020) (imposing permanent officer and director bar in part because documents filed in the case are "replete with statements showing that [the violator] does not show recognition of his own culpability" and "by failing to respond to the Commission's Motion, [the violator] has given no assurances against future violations").

Here, Kay has feigned ignorance of her culpability in the documents she has filed throughout this litigation, which include, as described above, documents demanding payment from the Court, asking for the Court's signature to do business with her, imposing liens on governmental officers,

and requesting that the Seventh Circuit and the SEC pay a $16.5 million debt owed to the United States. Kay has also neglected to respond to the instant motion for default judgment. Her scheme is grand in size and scope, both in terms of the number of people defrauded (over 70), as well as the amount of funds misappropriated. Therefore, the Court will impose a permanent officer and director bar as to Kay, as set forth at the conclusion of this Order and by separately entered default judgment.

### 4.2.3 Disgorgement of Ill-Gotten Gains

Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act, 15 U.S.C. § 78u(d)(3), (d)(5), and (d)(7), authorize the Court to order disgorgement in SEC enforcement actions. "The district court has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged. The amount of disgorgement ordered need only be a reasonable approximation of profits causally connected to the violation." *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474–75 (2d Cir. 1996) (internal citations omitted). "[T]he primary purpose of disgorgement as a remedy for federal securities laws violation is deterrence, through prevention of unjust enrichment on the part of the violator." *Id.* To prevent the violator from engaging in misconduct interest-free, the Court also has discretion to add prejudgment interest to a defendant's disgorgement amount. *Id.* at 1476.

Disgorgement is "unlike an award of damages." *Id.* at 1475. In 2020, the U.S. Supreme Court held, with respect to a disgorgement order in a SEC enforcement action, that "a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief." *Liu v. Sec. & Exch. Comm'n*, 140 S. Ct. 1936, 1940 (2020). Because disgorgement is an equitable remedy, the Court focuses on the principles enunciated by

*Liu*. Parenthetically, however, within the confines of the default judgment standard, the amount of disgorgement in this case is ascertainable with certainty. *Durham*, 370 F. Supp. 3d at 964 ("[T]he Commission has provided the Court with enough detail to support a reasonable approximation of ill-gotten gains.").

*Liu* teaches that "the imposition of joint and several liability for a disgorgement award is permissible so long as it is 'consistent with equitable principles.'" *U.S. Sec. & Exch. Comm'n v. Janus Spectrum LLC*, 811 F. App'x 432, 434 (9th Cir. 2020) (quoting *Liu*, 140 S. Ct. at 1939). For example, joint and several liability may be imposed "for partners engaged in concerted wrongdoing." *Liu*, 140 S. Ct. at 1939.

The SEC requests that disgorgement here be imposed against Kay, Xapphire, and Chao, jointly and severally. Such a request is appropriate under *Liu*. *See, e.g.*, *Sec. & Exch. Comm'n v. Bronson*, 602 F. Supp. 3d 599, 618–19 (S.D.N.Y. 2022), *aff'd sub nom. United States Sec. & Exch. Comm'n v. Bronson*, No. 22-1045-CV, 2022 WL 5237474 (2d Cir. Oct. 6, 2022) (joint and several liability may be imposed on individual defendant and his company where he was "primarily liable for the fraud that created the[] profits, was intimately involved in the perpetration of the fraud, and was a controlling person of the company") (citations omitted).

In this case, as described in *Bronson*, Kay was the brainchild of the scheme, was Xapphire's co-founder and CEO, and ran the scheme through entities she controlled. Therefore, Kay and Xapphire are liable jointly and severally for disgorgement. Chao is further jointly and severally liable as the relief defendant, and because the SEC's investigation revealed that a portion of the $4,060,212.00 that was misappropriated by Kay was spent by Chao, Kay's spouse. *See Sec. & Exch. Comm'n v. VerdeGroup Inv. Partners,*

*Inc.*, No. 2:21-CV-07663-SB-ADS, 2022 WL 2200409, at *5 (C.D. Cal. Jan. 14, 2022) (citing *Liu*, 140 S. Ct. at 1949) (relief defendant married to violator jointly and severally liable where "[n]othing in the record suggests . . . that [relief defendant] did not enjoy the fruits of the scheme," or that spouses' funds were not commingled, combined with lack of response from the relief defendant arguing the same).

As noted, the amount of disgorgement in this case with respect to Kay and Xapphire is both ascertainable with reasonable certainty and within the confines of *Liu*'s holding that such disgorgement shall not exceed the violators' net profits and be awarded for the benefit of the victims. The SEC requests an order of disgorgement in the amount of $4,060,212.00, plus prejudgment interest of $188,787.16. ECF No. 46 at 17. The amount represents the total amount of investor funds that Kay (with Chao) misappropriated for personal expenses, plus amounts that Kay used to repay investors from a previous venture, less the amount of performance fees Kay, through AK Equity and Xapphire, is estimated to have earned. *Id.*; *see also* ECF No. 46-1 at 6–7 (declaration of SEC staff accountant describing calculation process). In accordance with applicable authority, *First Jersey*, 101 F.3d at 1476, the amount of prejudgment interest was then calculated using the IRS underpayment rate. ECF No. 46-1 at 7.

The same is true with the amount of disgorgement attributable to Chao, which amount the SEC calculated by analyzing how much of the misappropriated funds were transferred to Chao and/or used to pay off his personal expenses. ECF No. 46-1 at 7. Moreover, the SEC's proposal, with which the Court agrees, is that Chao is only liable for his amount of disgorgement and prejudgment interest—$869,117.75—if Kay and Xapphire do not pay their full amount of disgorgement and prejudgment

interest. As to all amounts of disgorgement, the SEC has provided payment instructions and notes that the amounts disgorged, including prejudgment interest, will be provided to the victims. ECF No. 46 at 18–19; ECF No. 45-1. Therefore, an order of disgorgement as to Kay and Xapphire, jointly and severally, in the amount of $4,060,212.00, together with prejudgment interest of $188,787.16, and an order of disgorgement as to Chao, jointly and severally and to be paid only if Kay and Xapphire do not pay their entire amount of disgorgement and prejudgment interest, of $830,502.00, together with prejudgment interest of $38,615.75, will be entered at the conclusion of this Order and by separately entered default judgment.

### 4.2.4   Civil Penalty

Finally, Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d)(2), Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), and Section 209(e) of the Advisers Act, 15 U.S.C. § 80b-9(e), authorize the Court to impose civil penalties against any person who has violated the Acts. "Civil penalties are designed to punish the violator and deter future violations of securities laws." *U.S. S.E.C. v. Narvett*, No. 13-C-927, 2014 WL 5148394, at *3 (E.D. Wis. Oct. 14, 2014). The pertinent provisions each provide for three tiers of monetary penalties. The highest tier—the third tier—permits imposition of a civil penalty in the amount of "the gross amount of pecuniary gain to such defendant" if the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and "such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. §§ 77t(d)(2), 78u(d)(3), 80b-9(e).

A third-tier civil penalty is "authorized when certain aggravating circumstances exist." *Narvett*, 2014 WL 5148394, at *3. Those circumstances include:

> (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.

*Id.* As in *Narvett*, and for the reasons already explained, these factors are satisfied and a significant third-tier civil penalty is warranted in this case. Kay and Xapphire targeted a specific ethnic community with minimal knowledge of securities trading and the English language. Kay's conduct was intentional, and there is no question that it created losses in the millions for the investors. The conduct is also not isolated and continues today. Even if Kay is destitute, that is not, in this case, "reason to reduce the penalty." *Id.* at *4. As in *Narvett*, Kay's destitution and the facts here show that Kay is "a continuing threat to the public," because she continues to create new schemes and use funds to support her lifestyle rather than to repay her victims. *Id.*

Here, the SEC requests that Kay and Xapphire be ordered to pay a civil penalty of $4,060,212.00, jointly and severally. ECF No. 46 at 20. As explained above, this amount represents their net pecuniary gain from the scheme, as authorized by the third tier of the pertinent statutes. Indeed, the third tier authorizes a civil penalty of the *gross* amount of gain, so "[b]asing the penalty on the net extraction [is] favorable" to Kay and Xapphire. *Sec. & Exch. Comm'n v. Goulding*, 40 F.4th 558, 562 (7th Cir. 2022), *reh'g denied*,

No. 20-1689, 2022 WL 4100421 (7th Cir. Sept. 7, 2022) (affirming third tier penalty where violator ran company through pattern of fraud, including himself "wr[iting] all of the disclosure documents that the funds used to raise money"). As with the amounts disgorged and prejudgment interest, the SEC represents that the amount of collected civil penalties will ultimately be distributed to the harmed investors. ECF No. 46 at 19. The Court agrees that such a civil penalty is well warranted and appropriate here and will impose a civil penalty of $4,060,212.00, jointly and severally as to Kay and Xapphire, at the conclusion of this Order and by separately entered default judgment.

5.    **CONCLUSION**

Kay and Xapphire targeted a vulnerable group of victims for millions of dollars in a years-long scheme rife with fabricated documents and material misrepresentations and omissions. Kay continues to make these choices today. Kay and Xapphire must be held accountable for their pervasive and knowing violations of the Securities, Exchange, and Advisers Acts, and their victims must receive some semblance of hope for restitution. For all the reasons set forth herein, the Court finds that permanent injunctive relief is appropriate, disgorgement is warranted, and a third-tier civil penalty is supported and ascertainable with certainty. Consequently, these remedies will be imposed as set forth below and by separately entered default judgment. The Court can only hope that this Order, as the Wisconsin Order apparently failed to do, will deter Kay and Xapphire from future violations of the securities laws.

Accordingly,

**IT IS ORDERED** that Plaintiff Securities and Exchange Commission's motion for default judgment, ECF No. 45, be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Defendants Kay X. Yang and Xapphire LLC are permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

    (a)    to employ any device, scheme, or artifice to defraud;

    (b)    to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    (c)    to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

**IT IS FURTHER ORDERED** that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Order and the Default Judgment that follows by personal service or otherwise: (a) Defendants' officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendants or with anyone described in (a);

**IT IS FURTHER ORDERED** that Defendants Kay X. Yang and Xapphire LLC are permanently restrained and enjoined from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), in the offer or sale of

any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

    (a)    to employ any device, scheme, or artifice to defraud;

    (b)    to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    (c)    to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

**IT IS FURTHER ORDERED** that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Order and the Default Judgment that follows by personal service or otherwise: (a) Defendants' officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendants or with anyone described in (a);

**IT IS FURTHER ORDERED** that Defendants Kay X. Yang and Xapphire LLC are permanently restrained and enjoined from violating Section 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80(b)-6(1) and 80b-6(2), by using any means or instrumentality of interstate commerce, or the mails, to:

    (a)    employ devices, schemes or artifices to defraud any client or prospective client; and

    (b)    engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client.

**IT IS FURTHER ORDERED** that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following

who receive actual notice of this Order and the Default Judgment that follows by personal service or otherwise: (a) Defendants' officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendants or with anyone described in (a);

**IT IS FURTHER ORDERED** that, pursuant to Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), and Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), Defendant Kay X. Yang is prohibited from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l, or that is required to file reports pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d);

**IT IS FURTHER ORDERED** that Defendants Kay X. Yang and Xapphire LLC are liable, jointly and severally, for disgorgement of $4,060,212.00, representing net profits gained as a result of the conduct alleged in the Complaint, together with prejudgment interest thereon in the amount of $188,787.16, and a civil penalty in the amount of $4,060,212.00 pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), and Section 209(e) of the Advisers Act, 15 U.S.C. § 80b-9(e). Relief Defendant Chao Yang ("Relief Defendant") is liable, jointly and severally with Defendants Kay X. Yang and Xapphire LLC, up to the amount of funds he improperly received, for disgorgement of $830,502.00, representing his ill-gotten gains, together with prejudgment interest thereon in the amount of $38,615.75. Defendants Kay X. Yang and Xapphire LLC shall satisfy their disgorgement obligation by paying $4,248,999.16 to the Securities and Exchange Commission within 30 days after entry of this Order and the Default Judgment that follows. If Defendants pay this entire amount, Relief Defendant's obligation will be

deemed satisfied. If not, Relief Defendant shall satisfy his obligation by paying the amount for which he is liable, up to $869,117.75, to the Securities and Exchange Commission within 30 days after entry of this Order and the Default Judgment that follows;

**IT IS FURTHER ORDERED** that Defendants Kay X. Yang and Xapphire LLC and the Relief Defendant may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at:

http://www.sec.gov/about/offices/ofm.htm.

Defendants Kay X. Yang and Xapphire LLC and the Relief Defendant may also pay by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; Kay X. Yang and Xapphire LLC as Defendants and Chao Yang as a Relief Defendant in this action; and specifying that payment is made pursuant to this Order and the Default Judgment that follows;

**IT IS FURTHER ORDERED** that Defendants shall simultaneously transmit photocopies of evidence of payment and case identifying information to the Commission's counsel in this action. By making this payment, Defendants relinquish all legal and equitable

right, title, and interest in such funds and no part of the funds shall be returned to Defendants;

**IT IS FURTHER ORDERED** that the Commission may enforce the Court's judgment for disgorgement and prejudgment interest by using all collection procedures authorized by law, including, but not limited to, moving for civil contempt at any time after 30 days following entry of this Order and the Default Judgment that follows;

**IT IS FURTHER ORDERED** that the Commission may enforce the Court's judgment for penalties by the use of all collection procedures authorized by law, including the Federal Debt Collection Procedures Act, 28 U.S.C. § 3001 *et seq.*, and moving for civil contempt for the violation of any Court orders issued in this action. Defendants shall pay post judgment interest on any amounts due after 30 days of the entry of this Order and the Default Judgment that follows pursuant to 28 U.S.C. § 1961. The Commission shall hold the funds, together with any interest and income earned thereon (collectively, the "Fund"), pending further order of the Court;

**IT IS FURTHER ORDERED** that the Commission may propose a plan to distribute the Fund subject to the Court's approval. Such a plan may provide that the Fund shall be distributed pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002. The Court shall retain jurisdiction over the administration of any distribution of the Fund and the Fund may only be disbursed pursuant to an Order of the Court;

**IT IS FURTHER ORDERED** that, regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil penalties pursuant to this Order and the Default Judgment that follows

shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Defendants shall not, after offset or reduction of any award of compensatory damages in any Related Investor Action based on Defendants' payment of disgorgement in this action, argue that they are entitled to, nor shall they further benefit by, offset or reduction of such compensatory damages award by the amount of any part of Defendants' payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Defendants shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this Order and the Default Judgment that follows. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Defendants by or on behalf of one or more investors based on substantially the same facts as alleged in the operative complaint in this action; and

   **IT IS FURTHER ORDERED** that this action be and the same is hereby **ADMINISTRATIVELY CLOSED** in lieu of dismissed, only in light of the Court's retention of jurisdiction with regard to approval and distribution of any Fund that is formed.

   The Clerk of Court is directed to enter default judgment accordingly.

Dated at Milwaukee, Wisconsin, this 26th day of April, 2023.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge

This Order and the judgment to follow are final. A dissatisfied party may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **thirty (30)** days of the entry of judgment. See Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the thirty-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). Moreover, under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **twenty-eight (28)** days of the entry of judgment. The Court cannot extend this deadline. *See* Fed. R. Civ. P. 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The Court cannot extend this deadline. *See id*. A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.